```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     AT CHARLESTON
_____x
                              :
FRANK MORGAN,                 :        Civil Action
                              :
            Plaintiff,        :        No.  2:18-cv-01450
                              :
v.                            :
                              :        Date:  July 28, 2020
LOGAN COUNTY COMMISSION,      :
et al.,                       :
                              :
            Defendants.  :
_____x
```

            TRANSCRIPT OF TRIAL TESTIMONY OF WITNESS,
                   **DEPUTY J. D. TINCHER**
     BEFORE THE HONORABLE THOMAS E. JOHNSTON, CHIEF JUDGE
                UNITED STATES DISTRICT COURT
                IN CHARLESTON, WEST VIRGINIA


APPEARANCES:
For the Plaintiff:
                        KERRY A. NESSEL, ESQ.
                        The Nessel Law Firm
                        519-1/2 Eighth Street
                        Huntington, WV 25701

                        ABRAHAM J. SAAD, ESQ.
                        Saad Law Office
                        P. O. Box 1638
                        Huntington, WV 25717-1638

For the Defendants:
                        WILLIAM E. MURRAY, ESQ.
                        Anspach Meeks Ellenberger
                        Suite 1700
                        900 Lee Street East
                        Charleston, WV 25301

                        WENDY E. GREVE, ESQ.
                        Pullin Fowler Flanagan Brown &
                        Poe
                        901 Quarrier Street
                        Charleston, WV 25301


Court Reporter:         Ayme Cochran, RMR, CRR
Proceedings recorded by mechanical stenography;
transcript produced by computer.

**INDEX**

| PLAINTIFF WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | EXAMINATION |
|---|---|---|---|---|---|
| Dpt. JD Tincher | 3 | 49 | | | |
| | | 52 | | | |

| DEFENSE WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | EXAMINATION |
|---|---|---|---|---|---|
| None | | | | | |

| PLAINTIFF EXHIBITS | ADMITTED |
|---|---|
| None | |

| DEFENSE EXHIBITS | ADMITTED |
|---|---|
| None | |

1          PARTIAL PROCEEDINGS had before The Honorable Thomas E.

2    Johnston, Chief Judge, United States District Court,

3    Southern District of West Virginia, in Charleston, West

4    Virginia, on July 28, 2020, as follows:

5          (Prior proceedings preceded the following)

6                    THE COURT:  Plaintiff may call his next

7    witness.

8                MR. NESSEL:  Defendant J. D. Tincher, Your Honor.

9                COURTROOM DEPUTY CLERK:  Please raise your right

10   hand.

11          **DEPUTY JOSHUA D. TINCHER, DEFENDANT, SWORN**

12               COURTROOM DEPUTY CLERK:  You can have a seat right

13   there, please.

14               MR. NESSEL:  May I, sir?

15               THE COURT:  You may.

16                          **DIRECT EXAMINATION**

17               **BY MR. NESSEL:**

18   **Q.**  Please state your full name.

19   **A.**  Joshua David Tincher.

20   **Q.**  And how old are you, Mr. Tincher?

21   **A.**  32, sir.

22   **Q.**  Where are you from?

23   **A.**  Williamson, West Virginia.

24   **Q.**  Where do you currently work?

25   **A.**  Mingo County Sheriff's Department and Delbarton Police

```
 1    Department.
 2              THE COURT:  Do you have something in your mouth?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  What is it?
 5              THE WITNESS:  Just a mint.  I can get rid of it.
 6              THE COURT:  Oh, okay.  Alright.  I just wanted to
 7    make sure it wasn't chewing tobacco.
 8         I mean, this isn't a barber shop.
 9         (Laughter)
10              THE WITNESS:  No, sir.  I don't chew, sir.
11              MR. NESSEL:  May I continue, sir?  Thank you for
12    clearing that up.
13              BY MR. NESSEL:
14    Q.  And, previously, you worked for Logan Police
15    Department?
16    A.  Yes, sir.
17    Q.  And you're a defendant in this lawsuit?
18    A.  Yes, sir.
19    Q.  Okay.  And we've never met before?
20    A.  No, sir.
21    Q.  Did you know Frank Morgan prior to April 20th of 2018?
22    A.  I knew that they called him "Nitty".
23    Q.  Okay.  That's it?
24    A.  Yes, sir.
25    Q.  Do you remember answering discovery?  Don't tell me
```

1  what you and your lawyers talked about, but do you remember

2  answering discovery requests?

3  **A.**   Yes, sir.

4  **Q.**   Do you remember answering a request for admissions?  Do

5  you recall those?

6         MS. GREVE:  Your Honor, I believe this is an

7  attempt at improper impeachment.  If there's a response

8  that's inconsistent with a response to request for

9  admission, I believe that would be proper impeachment, but

10  this is not.

11         THE COURT:  Let's mic up.

12     (At side-bar)

13         THE COURT:  So, we're not very far into this, so I

14  have no idea where it's going.

15         MR. NESSEL:  Exactly, Your Honor.  I'm just

16  starting.  He denied a very important request for admission.

17  I'm going to question him about it.  And I have it right

18  before me and I will show it to him.

19         MS. GREVE:  So, I believe that he hasn't elicited

20  testimony that he believes is inconsistent with a prior

21  sworn statement.  So, Mr. Nessel can ask the witness the

22  question that was asked in the request for admission, but he

23  doesn't have to refer to it as, hey, you answered requests

24  for admissions under oath.  Isn't it true that's a lie?  I

25  mean, that's -- that's not how you use discovery.  That's

Deputy Joshua D. Tincher - Direct (Nessel)                    6

```
 1    not how you use depositions.

 2              MR. NESSEL:  That's --

 3              MR. GREVE:  You --

 4              MR. NESSEL:  That's not where I'm going with this.

 5    He answered one request for admission.  He denied a very

 6    important aspect of this case and I'm going to question him.

 7    He can say I do or don't recall.  I'm not going to go into

 8    any sworn statements.

 9              THE COURT:  Well, I think it's more appropriate to

10    just ask him the question now and then if what he says is

11    inconsistent with the admission, you can impeach him with

12    it.

13              MR. NESSEL:  That's exactly where I was going,

14    sir.

15              THE COURT:  Well, that wasn't how you were getting

16    there.

17              MR. NESSEL:  Oh, okay.

18              THE COURT:  But so the objection is sustained.

19              MR. NESSEL:  Thank you.

20         (Side-bar concludes)

21              BY MR. NESSEL:

22    Q.   Okay.  Do you go by "Officer" or what?

23    A.   It doesn't matter, sir.

24    Q.   What's your rank?

25    A.   I'm a deputy.
```

1    **Q.**   Okay.  So, you're a deputy?

2    **A.**   Yes, sir.

3    **Q.**   I'll call you "Deputy".  Thank you.

4    **A.**   Thank you.

5    **Q.**   Do you admit that when you worked for the LPD -- what

6    do I mean by "LPD"?

7    **A.**   Logan Police Department.

8    **Q.**   Do you admit that LPD's employees/agents have a duty to

9    protect the public, including arrestees, detainees, et

10   cetera?

11   **A.**   Yes, sir.

12   **Q.**   You do believe that you have a duty to protect them?

13   **A.**   Protect and serve, yes, sir.

14   **Q.**   Okay.  Do you remember answering questions with your

15   lawyer that were proffered by me and my client?

16   **A.**   No, sir, not -- I know that I've answered questions

17   from my lawyer, but I'm not sure which ones you're asking.

18   **Q.**   Okay.

19         MR. NESSEL:  Your Honor, I am not marking this for

20   an exhibit.

21         BY MR. NESSEL:

22   **Q.**   That portion is highlighted.  Could you read what the

23   -- not the style of the case.  That's up there.  Could you

24   read right there?  What does that state?

25   **A.**   "Defendant and Counterclaim Plaintiff, Officer J. D.

1    Tincher's, Response to Plaintiff's First Set of

2    Interrogations [sic], Request For Admissions, and Request

3    For Production of Documents."

4    **Q.**    Thank you, sir.  At the top of this page, what does

5    that state right here?

6    **A.**    "Requests for admissions."

7    **Q.**    And why don't you read request number 4 out loud,

8    please?

9    **A.**    "Admit that -- admit that LPD employees/agents have a

10    duty to protect the public, including arrestees, and

11    detainees, et cetera."

12    **Q.**    And when somebody is detained --

13    **A.**    Yes, sir.

14    **Q.**    -- that means they're being arrested, correct?

15    **A.**    No, sir.

16    **Q.**    Okay.  For somebody -- well, somebody has been arrested

17    and detained, those are two different things?

18    **A.**    Yes, sir.

19    **Q.**    Okay.  And to that request, what was your answer?

20    **A.**    Are you talking about the response, sir?

21    **Q.**    Yes, your response.

22    **A.**    Denied.

23    **Q.**    So, you denied back when you answered these, back in

24    November 14th of last year, you denied that individuals and

25    arrestees and detainees, that you had a duty to protect

1    them, correct?  That's what this document stated?

2    **A.**    That's what the document says, yes, sir.

3    **Q.**    Okay.  And did you ever verify those under oath as

4    required by the rules?

5    **A.**    I'm not sure, sir.

6    **Q.**    So, you agree -- well, strike that.

7         Now, let's go to Logan City Hall.  You took Mr. Morgan,

8    at one point, to a room, correct?

9    **A.**    Yes, sir.

10   **Q.**    Describe the room.

11   **A.**    That's our patrol room.  You go in.  It's actually been

12   updated now, but --

13   **Q.**    Why don't you describe it back then?

14   **A.**    Okay.  You would walk in.  As you walked in, there

15   would be our ticket writer, like parking meter.  There would

16   be his desk.

17        And then, there would be another officer's desk.  And

18   behind that, there would be another officer's desk.  And

19   then, there was like a step down and you go in and there

20   would be like two computers that we use.

21        And then, like there was -- along the walls was tables

22   that were attached to the walls.  And that's what the

23   computers sat on.  Underneath those, we had like file

24   cabinets where we could keep our stuff.

25   **Q.**    Describe the tables, sir.

 1    **A.**    They were attached to the wall.

 2    **Q.**    How long were they?

 3    **A.**    How long?

 4    **Q.**    How long, yes, sir?

 5    **A.**    I'm not sure, sir.  I've never measured them.

 6    **Q.**    Well, ballpark it for me.  You're familiar with the

 7    sport of basketball, right?

 8    **A.**    Yes, sir.

 9    **Q.**    You know those are ten-foot rims, right?

10    **A.**    Yes, sir.

11    **Q.**    Well, if you laid that down, would it be more than ten

12    feet long?

13    **A.**    I would say they were probably 12 feet, yes, sir.

14    **Q.**    Okay.  What about -- tell me what it's made of.

15    **A.**    I'm not very well with materials or anything, but it

16    would be like if you went to Lowe's, like the -- like it's

17    not real marble, but kind of looks like a counter top,

18    marble top.

19    **Q.**    Granite?

20    **A.**    Not sure, sir.

21    **Q.**    Fake granite?  You don't know?

22    **A.**    I don't know.

23    **Q.**    Okay.  What color was it?

24    **A.**    Like a tan, cream.

25    **Q.**    Did it have edges or was it rounded off?

Deputy Joshua D. Tincher - Direct (Nessel)                    11

1    **A.**    There was like a -- it was rounded, but there was kind

2    of like a -- just depends on what part you were at.  That's

3    why we actually had the remodel.  The department needed

4    updated pretty bad.  There was some holes in the rugs and

5    stuff like that.

6    **Q.**    Do you have any pictures?  Did you supply your attorney

7    with any pictures of this room with some tables in it?

8    **A.**    I don't know if I did or didn't.

9    **Q.**    Did you supply any pictures of the room itself?

10   **A.**    I don't know if I did or if another employee did.

11   **Q.**    Are there chairs in this room?

12   **A.**    Yes, sir.

13   **Q.**    Describe the chairs, please.

14   **A.**    Office rolling chairs like --

15   **Q.**    Like this one?

16   **A.**    No, sir.  Not as fancy.  It would be a computer chair.

17   Something that you --

18   **Q.**    How many --

19   **A.**    -- you buy at Wal Mart.

20   **Q.**    Oh, I beg your pardon.  What did you just say?

21   **A.**    Like a computer chair.  Like something you would buy at

22   Wal Mart.

23   **Q.**    Okay.  Easy to pick up?

24   **A.**    Yes, sir.

25   **Q.**    How tall were you back then in April of 2018?

Deputy Joshua D. Tincher - Direct (Nessel)                        12

```
1    A.    Probably 5'11".

2    Q.    How much did you weigh?

3    A.    Probably 200 pounds.

4    Q.    You weigh about the same size now?

5    A.    A little -- a little heavier now, sir.

6    Q.    Alright.  The medical records, none of the medical

7    records indicate that any officer, including you, informed

8    staff at the hospital that Mr. Morgan fell and hit his head

9    on a chair.  Do you have an explanation for that?

10   A.    No, sir.  I don't remember.  I know when I went to the

11   hospital, I got checked myself, and I don't remember

12   actually who I talked to or didn't talk to, as far as a

13   doctor goes.

14   Q.    Did you tell -- did you go around telling these doctors

15   and hospital staff that Mr. Morgan was out on the street

16   masturbating?

17   A.    No, sir, I didn't.

18   Q.    So, any doctor that came in here and told you that

19   would be lying?

20   A.    I don't remember telling them that, no, sir.

21   Q.    Did you tell any doctor or hospital staff that Mr.

22   Morgan was high on crystal meth?

23   A.    I don't remember, sir.  That was two years ago.  I

24   don't know if I was asked.  If I was asked, I wasn't told.

25   Or if they had asked me what had happened, if a doctor was
```

1    seeing him and had asked me, I would have told him what I

2    was told.

3    **Q.**   Well, you were asked and you didn't tell anybody that

4    Mr. Morgan fell and hit his head on the table, correct?

5    **A.**   I don't remember being asked, sir.

6    **Q.**   Okay.  So, if Dr. Hamza came in here and told you that

7    and then testified tomorrow -- do you know Dr. Hamza?

8    **A.**   No, sir, I don't.

9    **Q.**   When it comes to Mr. -- with Dr. Hamza, were you

10   belligerent with him?

11   **A.**   No, sir.  I wouldn't -- I don't know who that is.

12   **Q.**   Did you take Mr. Morgan to Logan Regional Medical

13   Center?

14   **A.**   No.  The ambulance did, sir.

15   **Q.**   Okay.  Did you arrive -- did you go there -- did you

16   meet him there?

17   **A.**   I don't remember.  I -- to be honest with you, I don't

18   remember being seen.  I know that I was seen, but I don't

19   remember who seen me at the hospital, but it was noted that

20   I was seen.

21   **Q.**   Okay.

22   **A.**   It kind of rocked me that night when he hit me.

23   **Q.**   All right.  Well, what do you think went through his

24   head when you were beating him?

25   **A.**   I wasn't beating him, sir.

Deputy Joshua D. Tincher - Direct (Nessel)                                    14

```
 1                MS. GREVE:  Objection.

 2                THE COURT:  Sustained.

 3                MR. NESSEL:  Sorry, Your Honor.  Withdrawn.

 4                BY MR. NESSEL:

 5     Q.   So, back to the hospital.  You got there.  Did you

 6     order a doctor -- did you tell a doctor that you were not

 7     going to un-cuff him from the stretcher?

 8     A.   Not that I remember, no, sir.

 9     Q.   Do you remember anything from that night?

10     A.   Yes, sir.

11     Q.   Do you have memory lapse problems because you're

12     picking and choosing between them.

13                MS. GREVE:  Objection, Your Honor.

14                MR. NESSEL:  Your Honor --

15                THE COURT:  Overruled.

16                MR. NESSEL:  May I respond, please?  The way she

17     was treating Ms. Hudson --

18                THE COURT:  I just overruled the objection.

19                MR. NESSEL:  Oh, I didn't hear.

20                THE COURT:  So, please proceed.

21                MR. NESSEL:  I think it's the mask.

22                THE COURT:  Well, it might be.

23                MR. NESSEL:  I apologize, sir.  Okay.

24                THE COURT:  Good excuse to take it off.

25                BY MR. NESSEL:
```

Deputy Joshua D. Tincher - Direct (Nessel)                    15

1    **Q.**   Again, did you tell -- when was the first time you told

2    somebody, and who was it, that Mr. Morgan fell and hit his

3    head on some desk or a table?

4    **A.**   I don't remember.

5    **Q.**   Do you remember telling somebody that?

6    **A.**   I remember telling my chief that.

7    **Q.**   Okay.  Who's your chief?

8    **A.**   The chief at the time.  Sorry.  Let me rephrase that.

9    Let me -- I remember telling my chief at the time when he

10   interviewed me, which would have been P. D. Clemens.

11   **Q.**   Chief P. D. Clemens?

12   **A.**   Yes, sir.

13   **Q.**   When did he interview you?

14   **A.**   I think it was the next day.

15   **Q.**   Okay.  Did he record this?

16   **A.**   Not to my knowledge.

17   **Q.**   Did he take any notes?

18   **A.**   Yes, sir.

19   **Q.**   Do you know why I requested those in discovery and you

20   did not supply them to me?  Do you have possession of those?

21   **A.**   No, sir, I do not.

22        MS. GREVE:  Objection, Your Honor.  Discovery

23   objections are not to be part of a trial.

24        THE COURT:  Let's -- let's mic up.

25        (At side-bar)

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

Deputy Joshua D. Tincher - Direct (Nessel)                    16

```
 1            THE COURT:  Now, what's the objection?
 2            MS. GREVE:  We have produced everything that was
 3   responsive.  I don't know.  What came out of counsel's mouth
 4   was, "I asked for this in discovery and can you tell me why
 5   you didn't give it to me."
 6            THE COURT:  Yeah, that's not an appropriate
 7   question for trial.
 8            MR. NESSEL:  I -- yeah.  I'll withdraw that, Your
 9   Honor.
10            THE COURT:  Alright.  Thank you.
11            MR. NESSEL:  Thank you, sir.
12        (Side-bar concluded)
13            MR. NESSEL:  May I proceed?
14            THE COURT:  You may.
15            MR. NESSEL:  Thank you.
16            BY MR. NESSEL:
17   Q.   Deputy.
18   A.   Yes, sir.
19   Q.   How long did this interview with P. D. Clemens last?
20   A.   Probably 10, 15 minutes.
21   Q.   Okay.  Who else was interviewed?
22   A.   At the same time as me, sir?
23   Q.   No, overall?
24   A.   I -- Officer Conley was interviewed by the chief.
25   Q.   Do you know if he was recorded?
```

Deputy Joshua D. Tincher - Direct (Nessel)

```
 1   A.    No, sir.  I wasn't in the room.

 2   Q.    Had you ever been interviewed before by Chief?

 3   A.    I'm not sure what you mean by "interviewed".

 4   Q.    And maybe that was a really bad question on my behalf,

 5   so I'll rephrase it.

 6         In an investigation of alleged -- well, strike that,

 7   too.

 8         Let me ask you this.  Other than interviewing for your

 9   job --

10   A.    Yes, sir.

11   Q.    Have you been interviewed by Chief concerning any

12   malfeasance on your behalf?

13             MS. GREVE:  Objection, Your Honor.  This is --

14             COURT REPORTER:  I'm sorry.  I can't hear.

15             THE COURT:  Let's mic up.

16         (At side-bar)

17             MS. GREVE:  His claims for --

18             COURT REPORTER:  I'm sorry.  I'm sorry.  Could you

19   start again, please?  I didn't have a chance to put my

20   headphones on.  Okay.

21             MS. GREVE:  His claims for negligent detention

22   supervision to any med mal claim have been dismissed.

23   Whether or not he was the subject of an internal

24   investigation for excessive force is absolutely an

25   inappropriate question.
```

Deputy Joshua D. Tincher - Direct (Nessel)                          18

 1                THE COURT:  I've already ruled on that.  Your

 2      objection is overruled.

 3                MS. GREVE:  Thank you.

 4                MR. NESSEL:  Thank you.

 5           (Side-bar concludes)

 6           BY MR. NESSEL:

 7      **Q.**   Had you been investigated for malfeasance on the job

 8      when your interview was recorded by P. D. Clemens?

 9      **A.**   I don't believe so, sir.  I'm not a trouble maker.

10      **Q.**   Okay, thank you.

11           Did you witness Mr. Morgan masturbating on the streets

12      in Logan County that night?

13      **A.**   Yes, sir.

14      **Q.**   Where did you see it?

15      **A.**   Stratton Street.

16      **Q.**   Okay.  Why don't you explain to me and these jurors

17      exactly what you saw.

18      **A.**   Yes, sir.  Start from the beginning be okay?

19      **Q.**   That's usually a good place to start.

20      **A.**   Okay.  Well, you asked a question about seeing him

21      masturbate, but I'll start back.  We was at the -- on Water

22      Street right between -- right around McDonald's.  And we

23      were flagged down by a silver car.  It was like an older

24      Focus.  And a female flagged us down and said, "Hey, there's

25      a man over on Stratton Street around the Old Fox Apartments.

 1    He's got all his clothes off and he's doing something, if

 2    you know what I mean", and she kind of put her hand back

 3    like this, like pointing that she had a little kid in the

 4    backseat.

 5         So, myself, I was driving, and Officer Conley went

 6    around to Stratton Street.  When we got out, Frank Morgan

 7    had all of his clothes off except for his underwear and they

 8    were scattered throughout the street there.  And he had the

 9    front of his underwear down and his hand on his private part

10    there.

11         And when I went to get out of the car, I told Officer

12    Conley, I said, "Stop.  Stop him."  And when Officer Conley

13    got out of the car, he went to get him up against the car

14    and Frank wasn't complying.  And I told him, "Put your hands

15    behind your back."  And Marissa started mouthing off to us

16    and I told her, I said, "Just go on down the street.  Go on

17    down the street", because Marissa had all her clothes on

18    and, to this point, she hadn't committed any cruiser to be

19    arrested.

20         And when that happened, Frank started fighting with

21    Officer Conley.  I deployed my pepper spray and I pepper

22    sprayed him.  It had no effect whatsoever on him.  He

23    actually jumped up on the hood of my cruiser and he caused

24    some damage on it.

25         And when he got up on the hood of the cruiser, he

Deputy Joshua D. Tincher - Direct (Nessel)                    20

```
 1    started screaming for us to kill him and he jumped off --

 2              COURT REPORTER:  I'm sorry.  Can you scoot closer

 3    to the microphone, please?  I'm having trouble hearing.

 4              THE WITNESS:  Yes, ma'am.  Sorry.

 5              COURT REPORTER:  That's okay.

 6              THE WITNESS:  Ane he told us -- and he said -- he

 7    started screaming, "Kill me.  Kill me."

 8         And when he got off the other side, I went to go after

 9    him.  Well, he kind of went -- he went around the car and

10    then Officer Conley went this side.  We went over there and

11    they were getting into an altercation.  He started back

12    towards me and, when he became aggressive towards me, I

13    pulled my ASP and I hit him with the ASP baton and it

14    knocked him back.  When it knocked him back, it knocked him

15    back into my mirror of my cruiser and broke the mirror.

16    I tried to grab him and get him to come down at that point.

17    He cussed me and was still refusing.

18         And Officer Conley come around the other side.  I'd --

19    let me back up there for a second.  When it first started,

20    when he went around the other side with Officer Conley,

21    that's when I got my radio and I called for officer

22    assistance.

23    Q.   Deputy, I really hate to interrupt you, but --

24    A.   Yes, sir.

25    Q.   I thought you were going to elaborate on the
```

Deputy Joshua D. Tincher - Direct (Nessel)                    21

1    masturbating thing.  Not the whole thing.  I'm going to get

2    to this part in a moment.  You said you saw him

3    masturbating, correct?

4    **A.**    Well, he had his underwear down and his hand on his

5    private part.

6    **Q.**    Okay.  That doesn't indicate masturbating, does it?

7    **A.**    No, sir.

8    **Q.**    Okay.  Alright.  And there are claims that there was a

9    911 call?  Somebody had called this in, as well?

10   **A.**    I don't remember there being a -- anyone saying

11   anything about a 911 call.  I was flagged down.

12   **Q.**    So, if there was -- okay.  So, you don't know of any

13   911 call, right?

14   **A.**    No, sir.

15   **Q.**    Alright.  So, if any Government document or criminal

16   complaint refers to that, do you know where that person got

17   that information?

18   **A.**    I don't know whether a bystander called it in or what.

19   **Q.**    Alright.

20              THE COURT:  Mr. Nessel, if you're at a convenient

21   stopping point, I think it would be a good time to take the

22   afternoon break.

23              MR. NESSEL:  Yes, sir.

24              THE COURT:  Okay.  Ladies and gentlemen of the

25   jury, I will excuse you to the jury room for a 10-15 minute

```
 1    break.

 2         (Jury excused from open court)

 3              MR. NESSEL:  Your Honor, may we?

 4              THE COURT:  Well --

 5              MR. NESSEL:  Or do you want to wait?

 6              THE COURT:  We'll wait until they're in the jury

 7    room.

 8              MR. NESSEL:  Okay.

 9              THE COURT:  I know I'm fond of the headsets, too,

10    but we don't have to use them when the jury is not here.

11         (Outside presence of jury)

12              THE COURT:  Alright.  Mr. Nessel?

13              MR. NESSEL:  Your Honor, I just didn't want Deputy

14    Tincher to speak with his attorney because we're in the

15    middle of -- direct, but cross examination.

16              MS. GREVE:  I'm aware of the rules, Your Honor.

17              THE COURT:  Alright.  Very well.

18              MR. NESSEL:  Thank you, sir.

19              THE COURT:  Alright.  We'll see you in 10 or

20    15 minutes.

21         (Recess taken)

22         (Outside presence of jury)

23              THE COURT:  Alright.  Let's bring in the jury,

24    please.

25         (Jury returned to open court)
```

Deputy Joshua D. Tincher - Direct (Nessel)

```
 1              THE COURT:  You can be seated.

 2         Ladies and gentlemen of the jury, welcome back.  Some

 3    of you may have noticed it was a little warm this afternoon.

 4    We have cranked up the air-conditioning, so it should cool

 5    off a little bit.  That's welcome relief for me and I know

 6    maybe some of you, as well.

 7         Alright.  Mr. Nessel, you may continue your

 8    examination.

 9              MR. NESSEL:  Thank you, Your Honor.

10              BY MR. NESSEL:

11    Q.   Alright.  Deputy, could you explain to the jury what a

12    CAD sheet is and what "CAD" stands for?

13    A.   Not sure what CAD stands for, but it's a 911 -- like

14    how 911 keeps up with their calls, like they -- how they log

15    their calls.

16    Q.   Okay.  And have you seen some of these, they're called

17    CAD abstracts, previously?

18    A.   I have seen CAD sheets, yes, sir.

19    Q.   CAD sheets, abstracts, are those the same things?

20    A.   Not sure.

21    Q.   Okay.  Well, I'm going to show you one here in a

22    moment.

23    A.   Yes, sir.

24    Q.   Okay.  So, what happens is that when you call in to,

25    say, the dispatch, do they record what's going down and
```

1   what's happening?

2   **A.**   Yes, sir.

3   **Q.**   So, it's not just 911 calls; it's actually

4   communications between officers or between officer and

5   dispatch?

6   **A.**   To my knowledge, they've always -- and when I was a

7   dispatcher, just what 911 -- the call.  Like when an officer

8   arrived, when he left, et cetera.

9   **Q.**   Okay.  And have you reviewed the CAD abstract or CAD

10  sheet concerning this matter?

11  **A.**   No, sir.

12  **Q.**   Okay.  Well, I'm going to show it to you.

13          MR. NESSEL:  Your Honor, this has previously been

14  marked as Plaintiff's 2 by Plaintiff's counsel.

15          BY MR. NESSEL:

16  **Q.**   Okay, Deputy, could you please look at that?  Is that

17  pretty much what a CAD sheet is?  It says "abstract" at the

18  top?

19  **A.**   Yes, sir.

20  **Q.**   Okay.  And let's go through a couple of things on this,

21  if we could.  LPD56, is that your badge number?

22  **A.**   No, sir.

23  **Q.**   What's that say right here?  58?

24  **A.**   Yes, sir.

25  **Q.**   Okay.  Was that your badge number in April of 2018?

Deputy Joshua D. Tincher - Direct (Nessel)                    25

1    **A.**    Yes, sir.

2    **Q.**    And your name is right next to it, correct?

3    **A.**    Yes, sir.

4    **Q.**    As well as being underneath it.  LPD55, is that Mr. --

5    excuse me, Officer Conley?

6    **A.**    Yes, sir.

7    **Q.**    Okay.  Response origin, quick call.  Why don't you

8    explain what that means?

9    **A.**    I'm not sure, sir.

10   **Q.**    Okay.  What about disposition code?  It says

11   "complete".  Do you know what that means?

12   **A.**    No, sir.

13   **Q.**    Okay.  No problem.  Alright.  Let's start down here.

14   This is military time.  Could you -- my finger is right

15   underneath.  So, let's just go with the fact that these are

16   all, until we say otherwise, April of 2018; would you agree

17   with me?

18   **A.**    Yes, sir.

19   **Q.**    What time is that?

20   **A.**    20:55.

21   **Q.**    Okay.  So, that's 8:55 to civilians, correct?

22   **A.**    Yes, sir.

23   **Q.**    It says "Stratton Street".  What does that mean?

24   **A.**    That's the location.

25   **Q.**    Okay.  Location of something going down perhaps?

1    **A.**   Yes, sir.

2    **Q.**   Okay.  Then underneath that is about three minutes

3    later.  It says, "Stratton Street, courthouse"; would you

4    agree with me there?

5    **A.**   Yes, sir.

6    **Q.**   Okay.  Now, what is resource activities?  What are

7    those?

8    **A.**   I'm not sure, sir.  I don't fill these out.

9    **Q.**   Okay.  Now, resource name, it has "58", and that's --

10   what is LPD58; do you recall?

11   **A.**   I worked at Logan Police Department and was Unit 58.

12   **Q.**   Okay.  Alright.  And "dispatched" and then "Tiffany"

13   there.  We're going to flip over to Page 2.  What do all of

14   these mean?  On the top from here up, what do those mean?

15   Are those pretty much the same thing that we just went

16   through a moment ago?  This one says "on scene."  Tell the

17   jury what that means.

18   **A.**   When the officer is on scene.

19   **Q.**   Okay.  What does this mean, "transporting"?

20   **A.**   I'd assume transporting like a prisoner or a courtesy

21   transport.

22   **Q.**   An arrestee, detainee, perhaps?

23   **A.**   Yes.

24   **Q.**   Okay.  And then "arrived".  Where did you arrive at

25   21:19 and 47 seconds?

 1    **A.**   City Hall.

 2    **Q.**   Okay.  And then, "dispatched at 22:18 and 41 seconds"?

 3    **A.**   I don't know, sir.

 4    **Q.**   Okay.

 5    **A.**   There's not enough detail.

 6    **Q.**   Alright.  I think that there is underneath.  So, we

 7    don't know what this means.  What does "complete" mean with

 8    L -- with Badge 58 and Badge 55?  What does "complete" mean

 9    at 02:55 and 02:55 both of you guys?  Is that you and

10    Officer Conley?

11    **A.**   I don't know.

12    **Q.**   Well, what's your badge number?

13    **A.**   58.

14    **Q.**   Is it on there?  Is that it?

15    **A.**   Yes, sir.

16    **Q.**   What does that say?

17    **A.**   "Complete".

18    **Q.**   And who is this, "55"?

19    **A.**   Conley.

20    **Q.**   And what's it say?

21    **A.**   "Complete."

22    **Q.**   Okay.  Now, let's go down to this.  We're going to back

23    up in time a little bit.  Somebody requested backup at

24    20:55:59, correct?

25    **A.**   Yes, sir.

1    **Q.**    Then what does "57 ER" mean at 20:58?

2    **A.**    I don't know, sir.

3    **Q.**    What about "17 ER"?

4    **A.**    I don't know.

5    **Q.**    At 20:58:02, who is Unit 19; do you recall?

6    **A.**    No, sir.

7    **Q.**    One unit -- or excuse me.  One male detained, correct?

8    **A.**    Yes, sir.

9    **Q.**    And how were these -- these general notes, are those

10    from you communicating -- communicating with dispatch like

11    on your mics, your radios?

12    **A.**    I would assume, sir.

13    **Q.**    Okay.  So, dispatch is getting this information from

14    whoever is calling it in on the radio, correct?

15    **A.**    Yes, sir.

16    **Q.**    Alright.  Great.  So, we go through a few of these and

17    go all the way down.  Now, what is this one right here at

18    21:19:30?  What's that say?

19    **A.**    "E. M. same at office."

20    **Q.**    What does that mean?

21    **A.**    I don't know.

22    **Q.**    What does "office" mean to you at Logan County Police

23    Department?

24    **A.**    City Hall.

25    **Q.**    City Hall?  Okay.  So, when we use the term "office"

 1    from here on out, we're talking about Logan City Hall,

 2    correct?

 3    **A.**    Yes, sir.

 4    **Q.**    Okay, great.  Okay.  What's -- "Out at office with one

 5    male at 21:19:44."  What does that mean?

 6    **A.**    An arrest.  Got a male at the office.

 7    **Q.**    So, you have a male at the office that's under arrest?

 8    **A.**    Uh-huh.

 9    **Q.**    Okay.  Now, somebody calls -- what's "Regional"?  Is

10    that Southwestern Regional Jail?

11    **A.**    I don't know if that's the jail or the hospital.

12    **Q.**    Well, LRMC is two underneath that.  Would you agree

13    with me that that's Logan Regional Medical Center?

14    **A.**    Yes, sir.

15    **Q.**    Okay.  So, "Regional" could mean regional jail and I

16    think it makes better sense down underneath.  Is that what

17    that means?

18    **A.**    Yes, sir.

19    **Q.**    Okay.  So, you're out of -- somebody is out of office,

20    55, at 22:28:31.  Civilian terms, that's 10:28 and

21    31 seconds, correct?

22    **A.**    Yes, sir.

23    **Q.**    In the p.m.  And then you arrive at 23:21?  Or had you

24    already been at Logan Regional Medical Center; do you

25    recall?

1    **A.**   No, sir.  No, sir.

2    **Q.**   Okay.  Let's go to this one, 00:44:47.  That would be a

3    little after midnight.  It would be 12:44 and 44 --

4    47 seconds, a.m., correct?

5    **A.**   Yes, sir.

6    **Q.**   So, that's shortly after midnight; am I right there?

7    **A.**   Yes, sir.

8    **Q.**   Okay.  So, it says, "Unit 16.  Do you know who that is?

9    **A.**   No, sir.

10   **Q.**   "10/8 from office."  What's 10/8 mean?

11   **A.**   Clear.

12   **Q.**   I beg your pardon?

13   **A.**   Clear.

14   **Q.**   Clear?  Okay.  So, you left office.  Then it says,

15   "10-89 x 1-M" or "x 1-M."  What does that mean, sir?

16   **A.**   One male.

17   **Q.**   Okay, one male.  Thank you.  "10-76 jail."  That means,

18   I assume, call the jail?  Somebody called?

19   **A.**   I don't know what 1076 means, sir.

20   **Q.**   Okay.  So, what is after that, would you agree with me,

21   contact the jail and let them know this man was being

22   combative; is that what it states so far?

23   **A.**   Yes, sir.

24   **Q.**   "Meet me with the COs to get this male from my

25   cruiser."

Deputy Joshua D. Tincher - Direct (Nessel)                    31

1    **A.**   Yes, sir.

2    **Q.**   I beg your pardon.  Is that what I just read?

3    **A.**   Yes, sir.

4    **Q.**   Is that what it says on Exhibit 2?

5    **A.**   Yes, sir.

6    **Q.**   Okay.  "To get this male from my cruiser", you don't

7    know who Unit 16 was -- was -- who was that?

8    **A.**   No, sir.  I don't remember.

9    **Q.**   Okay.  And it says, "10/8 Regional."  Does that mean

10   that's when they arrived at the jail, about 19 minutes

11   later?

12   **A.**   10/8 would be clear from the jail.

13   **Q.**   Okay.  So they had already gone to the jail and left?

14   **A.**   Yes, sir.

15   **Q.**   Okay.  Did you take anybody to the jail that evening?

16   **A.**   No, sir.

17   **Q.**   Do you know if anybody, any officer, took Mr. Morgan to

18   the jail that evening?

19   **A.**   No, sir.  They didn't take him to the jail.

20   **Q.**   Why is it stated on this CAD sheet that a combative

21   male was on his way to the jail?

22   **A.**   That could have been another male that someone else

23   arrested.  That was Unit 16 that made the arrest.

24   **Q.**   Okay.  So, all of this doesn't match up with other

25   things because Mr. Morgan did not go to the jail that

1    evening, correct?

2    **A.**    Correct.

3    **Q.**    Okay.  And you never took him to Southwestern Regional

4    Jail, right?

5    **A.**    No, sir.

6    **Q.**    Okay.  So, when somebody is being combative, your

7    testimony is that combative individual was not Frank Morgan,

8    right?

9    **A.**    Could you repeat it?

10    **Q.**    Yes.  Your testimony moments ago was the combative

11    individual that's addressed in the second to last entry on

12    this page was not Frank Morgan?

13    **A.**    No.  He didn't go to jail, sir.  I don't know who

14    they're talking about in that.

15    **Q.**    Okay.  Alright.  So, that's not Frank?  So, this

16    doesn't deal with just one call?  That deals with various

17    calls, correct?

18    **A.**    Yes, sir.

19    **Q.**    Okay.  Alright.  Do you know when Mr. Morgan actually

20    went to Southwestern Regional?

21    **A.**    No, sir.

22    **Q.**    Were you ever interviewed by the State Police about

23    this Morgan incident?

24    **A.**    No, sir.

25    **Q.**    Were you ever interviewed by the FBI?

1    **A.**    No, sir.

2    **Q.**    What about the U. S. Attorney's Office?

3    **A.**    No, sir.

4    **Q.**    Did any outside entity ever question you about Mr.

5    Morgan's allegations?

6    **A.**    No, sir.

7    **Q.**    So, there's no pending criminal charges against you,

8    right?

9    **A.**    No, sir.

10    **Q.**    And this 911 call that's alluded to, you've never heard

11    it, right, the one stating Mr. Morgan was masturbating?

12    **A.**    No, sir.

13    **Q.**    So, to the best of your knowledge, it don't exist, does

14    it?

15    **A.**    I don't know if it does or doesn't.

16    **Q.**    Okay.  And do you know who Unit 13 was on that CAD

17    sheet, by the way?

18    **A.**    No, sir.

19    **Q.**    Okay, great.  Thanks.

20          And when it says like "Unit 13", so to speak, does that

21    mean it's Sheriff's Office?  Because you guys go by "LPD"

22    and then a number, right?

23    **A.**    No, sir.

24    **Q.**    Okay.  Well, you did.  You're LPD-58.

25    **A.**    No, sir.  They wrote that that way.  That's not how I

Deputy Joshua D. Tincher - Direct (Nessel)                                    34

```
1    address it.

2    Q.   Great.  So, you don't know who the other ones are then?

3    A.   No, sir.

4    Q.   That matches up perfectly.  Thanks for clearing that up

5    for me.

6         So, Anthony Meade, he has a lawsuit pending against

7    you, as well, correct?

8    A.   No, sir.

9    Q.   No?

10   A.   No, sir.

11   Q.   So, you're not a defendant in a lawsuit?

12   A.   No, sir.  It's been -- his lawyers dropped it.

13   Q.   His lawyer withdrew as counsel?

14   A.   Yes, sir.

15   Q.   That's completely different than somebody dropping a

16   case.

17   A.   Okay.

18              THE COURT:  Was that a question?

19              MR. NESSEL:  I beg your pardon.

20              THE COURT:  I said, is that a question?

21              MR. NESSEL:  No.  I'm just clarifying it, Your

22   Honor.  I apologize.

23              BY MR. NESSEL:

24   Q.   Now, what were Mr. Meade's allegations?

25   A.   I don't know, sir.
```

1    **Q.**    Did he allege that you kicked him in the face?

2    **A.**    I do believe so, sir.

3    **Q.**    When did that occur allegedly?

4    **A.**    I don't know.

5    **Q.**    Was it before Mr. Morgan's allegations?

6    **A.**    Yes, sir.

7    **Q.**    Did P. D. Clemens question you in the same manner he

8    did in regard to Mr. Morgan?

9    **A.**    Yes, sir.

10   **Q.**    Did he record that?

11   **A.**    I don't know.

12   **Q.**    Did he take any notes?

13   **A.**    Yes, sir.

14   **Q.**    Okay.  In regard to just Frank, in regard to Mr.

15   Morgan, were you ever told that an official investigation

16   was open by any -- anybody?

17   **A.**    Not that I remember.

18   **Q.**    Okay.  Now, this video -- or, excuse me, what you

19   claimed -- what did you claim that Mr. Morgan said, "I want

20   to die"?

21   **A.**    No, sir.

22   **Q.**    What's he saying?

23   **A.**    At what time?

24   **Q.**    Well, you're on the street.  You're out on Stratton

25   Street.  And you're stating -- you testified, but before I

1    cut you off, again, I don't mean to be rude -- that Mr.

2    Morgan was saying, "I want to die.  I want to die."  You

3    testified to that prior to the break.  Do you recall?

4    **A.**   No, sir.

5    **Q.**   Okay.  So, you never heard him say, "I want to die"?

6    **A.**   Later on -- I didn't finish the testimony, but later

7    on, he did say "I want to die", yes, sir.

8    **Q.**   Okay.  Where did he say it?

9    **A.**   When he was being handcuffed.

10   **Q.**   Okay.  When you're outside?

11   **A.**   Uh-huh.

12   **Q.**   And it's on video, correct?

13   **A.**   Uh-huh.

14   **Q.**   And he's saying, "I'm going to die" or "I want to die"?

15   **A.**   What I heard was, "I want to die."

16   **Q.**   Okay.  That's what you heard?

17   **A.**   Yes, sir.

18   **Q.**   Have you watched the video?

19   **A.**   A long time ago, yes, sir.

20   **Q.**   Okay.  Alright.  Is there -- just out of curiosity, is

21   there a reason why you're recalling in vivid detail various

22   events on April 20th of 2018, but you can't recall other

23   things?

24   **A.**   The altercation stands out quite -- you know, quite

25   well.  At the hospital -- I don't really remember what went

1    on at the hospital.  I can't remember that.  But I had to do

2    a report on what happened on the street and in the office

3    and I remember making a report.

4    **Q.**    Who -- who did you submit this report to?

5    **A.**    The Logan Police Department.

6    **Q.**    Who specifically?

7    **A.**    We turned it in to a box.  Or, when I worked there, we

8    submitted to a box, sir.

9    **Q.**    What kind of box?

10   **A.**    A report box.  It had a box on the wall that said

11   "Reports" and you turned your report in to the box.

12   **Q.**    Alright.  Let's shift back to Meade.  Did you kick

13   Meade in the face?

14   **A.**    I kicked Meade.  I don't think I hit him in the face,

15   sir.  He was trying to get Deputy Mynes's gun from his gun

16   belt and he'd committed a robbery and I was aware that he

17   had a knife on him, as well, that, actually, we recovered

18   from underneath him.

19   **Q.**    So, where did you kick him about his body?

20   **A.**    About in the shoulder area.

21   **Q.**    By his head?

22   **A.**    Yes, sir.

23   **Q.**    Were you aiming for his head?

24   **A.**    No, sir.

25   **Q.**    Now, did you inquire why Mr. Morgan was adjusting his

1    pants, or why his pants were down or, as you said, off?  Did

2    you inquire why?

3    **A.**   He had no pants on.

4    **Q.**   He had boxers on.  You just testified to that.

5    **A.**   Correct, but no pants.

6    **Q.**   He wasn't masturbating.  You already testified to that.

7    **A.**   I testified that I didn't see him, sir.

8    **Q.**   To the best of your knowledge, nobody else did either,

9    did they?

10   **A.**   I don't know.

11   **Q.**   Okay.  Alright.  And he wasn't on crystal meth because

12   the toxicologist's report came back and said nothing.  So,

13   you're aware of that, right?

14   **A.**   No, sir.

15   **Q.**   Okay.  Well, we'll have to clear that up.  So, Mr.

16   Morgan is getting -- let's just say, after the incident,

17   which the jury is going to watch this on a video, of course.

18   He was handcuffed and placed in the back of a cruiser,

19   correct?

20   **A.**   Yes, sir.

21   **Q.**   And he was brought to City Hall, correct?

22   **A.**   Yes, sir.

23   **Q.**   Who is in the cruiser with him?

24   **A.**   Officer Conley.

25   **Q.**   Alright.  And you arrived at City Hall?  How long does

1    it take to get from where you were to City Hall?

2    **A.**   Depending on traffic, anywhere from 30 seconds to

3    five minutes.

4    **Q.**   Okay.  Well, that makes a lot of sense.  What about

5    that time of the evening, around 9:00 or 10:00?

6    **A.**   Maybe 2-3 minutes.

7    **Q.**   Okay.  So, you get there and you bring -- you take --

8    Ms. Hudson, you heard her testify that you dragged Frank

9    right out of the car.  Did you drag him out of the cruiser?

10   **A.**   No, sir.

11   **Q.**   Okay.  How did he get out of the car?

12   **A.**   He got of the car.  We got him over towards the door

13   and then put one leg down and kind of pulled him up out of

14   there.

15   **Q.**   And did he fall?

16   **A.**   No, sir.

17   **Q.**   Was -- Ms. Hudson was present though when he was taken

18   out of the car, right?

19   **A.**   No, sir.  Not that I recall.

20   **Q.**   Well, you recalled a lot of stuff from moments before

21   that.  Why don't you recall that?

22   **A.**   Because I didn't transport her.  I didn't know where

23   she was.

24   **Q.**   Right.  First of all, who transported her because she

25   didn't know?

1    **A.**    Officer Ziegler.

2    **Q.**    Ziegler?

3    **A.**    Yes, sir.

4    **Q.**    Okay.  Actually, she did know that.  She said she was

5    there right behind him.  So, you don't know if she saw it or

6    not; is that what your testimony is?

7    **A.**    Yes, sir.

8    **Q.**    Okay.  Alright.  So, describe how you get to this room

9    where the -- where Mr. Morgan was taken.  How do you get

10   there?

11   **A.**    He walks in.

12   **Q.**    No, how do you get there?  Do you walk down stairs?  Do

13   you --

14   **A.**    Oh, there's a little -- like a little ramp, little

15   concrete ramp that levels out with City Hall.  You go in the

16   door and turn left, walk maybe 15 feet, turn right into the

17   office.  And then, as I described our office, that's where

18   you would be.

19   **Q.**    Okay.  Alright.  So, how long is the walk from the

20   cruiser to that room?  Excuse me.  That was a bad question

21   because there's two ways you could answer me.  How long, not

22   length-wise, not feet, yards, meters, how long does it take

23   to get there?  That's probably a better question.

24   **A.**    Myself walking alone?

25   **Q.**    No, with a detainee or an arrestee?

1    **A.**    If they're walking, maybe a minute.

2    **Q.**    Okay.  Alright.  So, and Ms. Hudson was placed outside

3    the door, correct?

4    **A.**    No, sir.  She was in the other office.

5    **Q.**    Okay.

6    **A.**    When I walked -- we separated them.

7    **Q.**    Well, you separated them and they came in two different

8    cruisers, right?

9    **A.**    Uh-huh.

10   **Q.**    And so, you separated them when they got there.  Did

11   Ms. Hudson go to this area prior to or after Mr. Morgan?

12   **A.**    I never dealt with Ms. Hudson, sir.  I don't know where

13   she went.

14   **Q.**    Okay.  So, you have no idea who brought her and put her

15   outside that room?

16   **A.**    I don't remember her being outside the room ever.

17   **Q.**    Okay.  We'll start with that.  You don't know who --

18   who -- what was done with her, right?

19   **A.**    Correct.

20   **Q.**    What -- so, you don't know if she got there before or

21   after, correct?

22   **A.**    Correct.

23   **Q.**    Alright.  So, you brought Morgan into the room.  Who is

24   in that room with you?

25   **A.**    Myself and Deputy Crum.

1    **Q.**   What about Deputy Tucker?

2    **A.**   I don't remember Deputy Tucker even being at City Hall

3    that night.

4    **Q.**   Okay.  So, if other people say that --

5    **A.**   I know he never was in that room with us.

6    **Q.**   Okay.  And was Conley in that room?

7    **A.**   No, sir.

8    **Q.**   Okay.  So, just you and Crum?

9    **A.**   Yes, sir.

10   **Q.**   And Crum, who did he work with at that point?

11   **A.**   The Logan County Sheriff's Department.

12   **Q.**   Okay.  And you worked for Logan County Police

13   Department?

14   **A.**   Yes, sir.

15   **Q.**   But we're talking about Logan, West Virginia.  We're

16   not talking about Manhattan.  We're not talking about

17   Philly.  We're not talking about L. A., right?

18   **A.**   Right.

19   **Q.**   So how many people are on the force at LPD at that

20   time?

21   **A.**   Would have been seven and eight counting the chief.

22   **Q.**   Okay.  So, I assume, considering there's eight, not

23   even enough to fill a baseball team, that you know all of

24   these people?

25   **A.**   Yes, sir.

Deputy Joshua D. Tincher - Direct (Nessel)                          43

```
 1    Q.   And you work with them on a daily basis?

 2    A.   Yes, sir.

 3    Q.   Okay.  And how many sheriff's deputies were there at

 4    that time, if you know, because you didn't work there?

 5    A.   Maybe 18.

 6    Q.   Okay.  18?  Are you -- do you work with those guys?  Do

 7    you work on cases together, things like that?

 8    A.   Yes, sir.

 9    Q.   Okay.  So, you're familiar with all of those -- not

10    just guys -- guys, females, males, you're familiar with

11    them, correct?

12    A.   Yes, sir.

13    Q.   And you know the sheriff?

14    A.   No, sir.

15    Q.   You don't know Sheriff Dingess-Porter?

16    A.   Not personally.

17    Q.   Okay.  But you know who she is?

18    A.   Yes, sir.

19    Q.   Okay.  Alright.  So, you've got a total -- including

20    the chief and the sheriff, you've got a total of law

21    enforcement officers in those two entities of about 25 or 26

22    people, right?

23    A.   Correct.

24    Q.   Okay.  Alright.  So you-guys know each other?

25    A.   Yes, sir.
```

Deputy Joshua D. Tincher - Direct (Nessel)                    44

1    **Q.**   And you guys have the same common goal, right, which

2    you've stated, protect and serve?

3    **A.**   Yes, sir.

4    **Q.**   Okay.  Alright.  You work criminal cases together, so

5    on and so forth?

6    **A.**   Yes, sir.

7    **Q.**   Alright.  So, are you friends with Deputy Crum?

8    **A.**   Yes, sir.

9    **Q.**   Were you here when Mynes testified a few moments ago?

10   **A.**   Yes, sir.

11   **Q.**   Sitting right over there, weren't you?

12   **A.**   Yes, sir.

13   **Q.**   And he testified Crum was not in that room; do you

14   recall that?

15   **A.**   He said that he didn't know, didn't see him in there.

16   **Q.**   Okay.  He didn't see him in there?

17   **A.**   Yes.

18   **Q.**   Okay.  Okay.  Were you married in April of 2018?

19   **A.**   Yes, sir.

20   **Q.**   Did you wear a wedding band like most married people?

21   **A.**   Yes, sir.

22   **Q.**   Just to get down to just brass tacks here, is there a

23   pole in that room, a metal pole?

24   **A.**   No, sir.

25   **Q.**   Is there places to put a metal pole?  I mean, you've

Deputy Joshua D. Tincher - Direct (Nessel)                    45

```
 1    got tables.  Are there cabinets and things in there?

 2    A.    Yes, sir.

 3    Q.    Are there tops of cabinets?

 4    A.    No, sir.

 5    Q.    There's not?

 6    A.    It's -- we've got real short file cabinets go

 7    underneath the desk.

 8    Q.    Oh, okay.  Okay.

 9    A.    There was no like big tall cabinets or anything like

10    that.

11    Q.    Oh, okay.  Alright.  Thanks for clearing that up, as

12    well.  And I assume these cabinets have drawers in them,

13    correct?

14    A.    Yes, sir.

15    Q.    Okay.  Alright.  And these chairs that you've testified

16    previously are ones that aren't extremely heavy like these

17    U. S. government chairs, right?

18    A.    Correct.

19    Q.    So, they can easily be picked up and tossed around?

20    A.    Correct.

21    Q.    And Mr. Morgan is kind of -- kind of pudgy now, but how

22    big was he back in the day?

23    A.    Maybe about 20 pounds lighter than that right there.

24    Q.    Okay.

25    A.    Maybe a little more.
```

Deputy Joshua D. Tincher - Direct (Nessel)                    46

1    **Q.**   Alright.  You're just ballparking it.  I understand.

2              MR. NESSEL:  Forgive me, Your Honor.  Just a

3    moment, please.  We're almost finished.

4         (Pause)

5              BY MR. NESSEL:

6    **Q.**   Did you clink anything against your wedding band that

7    evening?

8    **A.**   No, sir.

9    **Q.**   Okay.  Alright.  Let's shift back to Exhibit 2.

10             MR. NESSEL:  And, Your Honor, I'm almost finished.

11             BY MR. NESSEL:

12   **Q.**   We're going back to that one exhibit I showed you

13   earlier.  Okay.  On the scene at Stratton Street at 8:55,

14   correct?

15   **A.**   My screen is not on.

16   **Q.**   Right here.

17   **A.**   My screen is not on.

18   **Q.**   Oh, it's not?

19   **A.**   Yes, sir.

20   **Q.**   Do you have it up there?

21   **A.**   Yes, sir.

22   **Q.**   Oh, thank you.  Okay.  On scene 8:55:54 seconds,

23   correct?

24   **A.**   Yes, sir.

25   **Q.**   And let's shift down here at the -- at 8:55:59 seconds,

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

Deputy Joshua D. Tincher - Direct (Nessel)

1    5 seconds later, somebody requested backup.  Who did that;

2    do you recall?

3    **A.**   That would have been me, sir.

4    **Q.**   So, you requested backup five seconds after you got on

5    the scene?

6    **A.**   No, sir.

7    **Q.**   What does that mean then?  Explain that.

8    **A.**   Sometimes, like if dispatch hasn't made a CAD sheet, I

9    know this from experience, like say they -- they probably --

10    they could have started the CAD sheet and put us on a call

11    at 8:55.  And then, just because of the fact that I

12    requested backup, then they go -- they make the call.  Then

13    they put the backup call.  So, it could have took them, you

14    know, 5-10 seconds to set the call, then put that I called

15    for backup.

16    **Q.**   Okay.

17    **A.**   To put us out on the call.

18    **Q.**   Alright.  So, these are imperfect documents?

19    **A.**   Correct.

20    **Q.**   Okay.  Are you familiar with medical records and how

21    they're kept or anything like that?

22    **A.**   No, sir.

23    **Q.**   Okay.  Alright.  You heard Ms. Hudson's testimony,

24    correct, sir?

25    **A.**   Yes, sir.

1    **Q.**   How did Mr. Morgan arrive on the deck of that room, on

2    the floor?

3    **A.**   From when I took him down and he -- I think he hit his

4    head on the table, not a hundred percent sure if he hit it

5    or didn't hit it.  But when he went down, he stopped moving

6    around.  He was still making noises.  I rolled him over and

7    handcuffed him.

8    **Q.**   He was only handcuffed going into the room?

9    **A.**   Yes, sir.

10   **Q.**   Okay.  When did you kick him in the face?

11   **A.**   I didn't kick him in the face.

12   **Q.**   When did you hit him with a pipe?

13   **A.**   Didn't hit him with a pipe, sir.

14   **Q.**   When did you slam a chair on him?

15   **A.**   Did not do that, sir.

16   **Q.**   Why was he screaming and crying?

17   **A.**   I don't recall him doing that, sir.

18   **Q.**   Why is he begging Jesus for his sins; do you have any

19   idea?

20   **A.**   He didn't do that, sir.

21   **Q.**   Well, did he forgive you for your sins for almost

22   killing him?

23   **A.**   I don't know what he forgave, but he never said that.

24   **Q.**   Okay.  When did -- your memory is going in and out of

25   that evening, but when did he strike you and where; "he"

Deputy Joshua D. Tincher - Cross (Murray)                    49

1    being Mr. Morgan?

2    **A.**    If you're talking about when he struck me on Stratton

3    Street, it was when I got Marissa Hudson off of Officer

4    Conley's back.  The -- when I went to get her, I popped my

5    handcuff case.  When I went to cuff her, I got struck from

6    behind in my left eye.  Kind of rocked me.  And I turned

7    around and that's when he was screaming.  He jumped up on

8    the cruiser and screamed, "Kill me", and jumped up off the

9    other side.

10   **Q.**    Did you inquire about his medical condition that he

11   kept bringing up to you on the street?

12   **A.**    He never brought up a medical condition, sir.

13   **Q.**    Did you inquire when Ms. Hudson brought up a medical

14   condition about his hernia?

15   **A.**    She didn't bring up a medical condition.

16          MR. NESSEL:  That's all I have right now.  Thank

17   you, Your Honor.

18          Thank you, Officer.

19          THE COURT:  Cross examination.

20          MR. MURRAY:  Yes, Your Honor.

21                          **CROSS EXAMINATION**

22          **BY MR. MURRAY:**

23   **Q.**    So, you pulled up because you had gotten a complaint

24   from a citizen?  And you pulled up and you and Officer

25   Conley got out of your car, correct?

Deputy Joshua D. Tincher - Cross (Murray)

1    **A.**    Yes, sir.

2    **Q.**    And then, was it at that point that Ms. Hudson jumped

3    on Mr. Conley, Officer Conley?

4    **A.**    Could you repeat it, sir?

5    **Q.**    Well, at what point did Marissa Hudson jump on Officer

6    Conley's back?

7    **A.**    Officer Conley got out of the vehicle, advised Frank

8    Morgan to stop.  I came around the driver's side.  Officer

9    Conley attempted to get Morgan against the vehicle and

10   that's when he started striking Officer Conley.

11       I pulled my pepper spray and pepper sprayed him.  It

12   didn't affect him at all.  And that -- right around that

13   same time, that's when Marissa got back -- she came back.

14   Never really left, but she had acted like she was going to

15   walk away.  She came back and got on Officer Conley's back.

16   I grabbed her.  And when I grabbed her, I -- like I said

17   before, I went to pop my handcuffs, and when I popped my

18   handcuffs, she was being combative, as well, and I got hit

19   from the -- from behind.

20   **Q.**    Okay.  Now, at that point, had you called for officer

21   assistance?

22   **A.**    No, sir.

23   **Q.**    Okay.  So, what was it that made -- you did call for

24   officer assistance.  You've testified to that.

25   **A.**    Yes, sir.

1    **Q.**   So, what was it that made you as a police officer at

2    that point in time call for an officer assistance?

3    **A.**   I was rocked.  It's embarrassing to say, but honestly.

4    So, where I got hit blind-sided, it kind of dazed me a

5    little bit there.  And when Morgan started around the other

6    side of the car at Conley, when he was going back and forth,

7    I pulled my radio and called for backup because we had two

8    defendants out there.

9    **Q.**   And I believe it says something like, "Officer

10   assistance needed on Stratton Street."

11   **A.**   Yes, sir.

12   **Q.**   And when you make that call, does that call then go out

13   to the other officers on the network?

14   **A.**   Yes, sir.

15   **Q.**   It's not necessary for the dispatcher to then dispatch

16   an officer because the officers hear that when it goes out,

17   don't they?

18   **A.**   Correct.

19   **Q.**   And the officers are trained that when they hear an

20   officer needs assistance or an officer assistance call,

21   everyone in the location responds automatically, correct?

22   **A.**   Yes, sir.

23   **Q.**   Don't have to be waited to be dispatched to go?

24   **A.**   No, sir.

25   **Q.**   And when you're a police officer and you are responding

```
 1    to an officer assistance, is there an assumption that the

 2    officer that needs the assistance is in trouble?

 3    A.   Yes, sir.

 4    Q.   And what are you to do when you get on the scene?

 5    A.   Stop the threat.

 6         MR. MURRAY:  That's all I have.  Thank you, Your

 7    Honor.

 8                    CROSS EXAMINATION

 9         BY MS. GREVE:

10    Q.   Was Frank Morgan so combative that it required a third

11    officer to get him down to the ground?

12    A.   Yes, sir [sic].  Yes, ma'am.  Sorry.

13    Q.   I've been called worse.

14         You've been asked a number of questions about what

15    happened and then there's reference to a tape that, of

16    course, the jury hasn't seen yet.  At what point in the

17    incident on Stratton Street do you know that that video

18    starts?

19    A.   Marissa had done hit Officer Conley and had done struck

20    me in the leg and Morgan had done hit me in the eye.  He had

21    done ran up on top of the cruiser, causing damage, and

22    dropped off the other side.

23    Q.   So, he had actually leapt on top of the hood of the

24    cruiser?

25    A.   Yes, ma'am.
```

1    **Q.**   And was there an attempt -- if you know, after Mr.

2    Morgan was handcuffed, was there an attempt from law

3    enforcement officers on the scene to get other evidence from

4    any other bystanders, to try to get bystander video from the

5    incident when you were assaulted?

6    **A.**   Yes, ma'am.

7    **Q.**   And were you ever able to locate any?

8    **A.**   Just the one video.

9    **Q.**   You've been asked about whether or not you kicked Tony

10   Meade in the face.  Can you tell the jury what happened?

11   I'll represent Tony Meade, I guess you got involved after he

12   was in a high speed pursuit through several counties.

13           MR. NESSEL:  Your Honor, I object.  She's leading.

14   She's literally giving a narrative.  She should just ask a

15   question.

16           BY MS. GREVE:

17   **Q.**   So, can you tell the jury why you came across Tony

18   Meade at all?

19   **A.**   Yes, ma'am.  I don't recall the certain date, but I

20   know that the call came out that the Mingo County Sheriff's

21   Office was in pursuit with an individual.  They wasn't real

22   clear as to who he shot at, but it was known that he had

23   fired a weapon and it was -- we was to be aware of that and

24   that they were coming over Mud Fork Mountain.

25           I am not sure if you guys are familiar -- how familiar

1    with Mud Fork.  You -- at one point, you're in Mingo County,

2    and then, Mud Fork goes into Logan County and you're still

3    in Logan County.

4        So, myself and Officer James Sheppard went down to

5    block the road.  When we blocked the road, Deputy Mynes

6    actually ended up stopping the vehicle with his cruiser.

7    And when they got him out, he was resisting arrest and they

8    was screaming, "Knife.  Knife."  And I saw him, I personally

9    saw him with my own eyes, go for Deputy Mynes's gun.  And I

10   couldn't let that happen.  That kind of shook me up talking

11   about it.

12       So, I kicked Tony Meade in an attempt to stop him

13   because I did not want him to get an officer's gun and kill

14   him, myself or anybody else.  And, actually, after we ended

15   up getting control of him and handcuffing him, there was a

16   knife recovered right underneath him.

17   **Q.**   And that's the case that they're -- the lawsuit that

18   Mr. Nessel was referring to?

19   **A.**   Yes, ma'am.

20           MS. GREVE:  Thank you.  No further questions.

21           THE COURT:  Mr. Nessel, anything further?

22           MR. NESSEL:  I don't think so, Your Honor.  Thank

23   you though.

24           THE COURT:  Alright.  Thank you.

25       You may step down.

1          (Testimony of witness concludes)

2          (Further proceedings followed)

3

4

5    CERTIFICATION:

6          I, Ayme A. Cochran, Official Court Reporter, certify

7    that the foregoing is a correct transcript from the record

8    of proceedings in the matter of Frank Morgan,

9    Plaintiff/Counterclaim Defendant v. Logan County Commission,

10   et al., Defendants/Counterclaim Plaintiffs, Civil Action No.

11   2:18-cv-01450, as reported on July 28, 2020.

12

13   s/Ayme A. Cochran, RMR, CRR                    October 21, 2020

14   Ayme A. Cochran, RMR, CRR                              DATE

15

16

17

18

19

20

21

22

23

24